EXPERT OPINION OF PAUL F. AMORUSO, CPCU

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

CIVIL ACTION NO. 1:07CV893JMR

In the case of:

RSUI INDEMNITY

V

NEW PALACE CASINO, LLC.

AND COUNTER CLAIM OF

NEW PALACE CASINO, LLC.

V

RSUI INDEMNITY

I am Paul Amoruso, CPCU, 8 Old Mattapoisett Neck Road, Mattapoisett, Massachusetts 02739. I am currently self-employed as an insurance and business consultant and I have thirty-seven years of experience working in the insurance industry for several major insurance companies.

From 1969 to 1989 I was employed by Liberty Mutual Insurance Company (Liberty). I began my association with Liberty as a casualty claims adjuster handling personal and commercial automobile, commercial business, workers compensation and first party claims. I was a property specialist and graduated from Vale Technical in Blairsville, Pennsylvania. Thereafter, I was promoted to Liberty's home office as a commercial claims examiner. As a claims examiner I was responsible in all 50 states, Canada, Mexico and Puerto Rico for flammable fabric claims and other commercial and personal claims issues. During my tenure as a claims examiner I was responsible for the claims handling of thousands of claims, all in litigation or pre-litigation, on issues of liability, damages and coverage.

**Exhibit 1**

1

I was promoted and transferred to Liberty's New Bedford, Massachusetts office as claims manager. Under my management the office grew from one of Liberty's smaller offices to the thirtieth largest out of four hundred and sixty-five in the United States. I was responsible for homeowners, workers compensation, commercial first and third party claims and personal automobile. I was a member of the Risk Management Team charged with evaluating risk and controlling potential losses.

After my employment with Liberty, I joined Trust Group Inc., who owned Trust Insurance Company (Trust). I remained with Trust from 1989 to1999. During my tenure with Trust I established and wrote the Claims Manual for Uniform Claim Handling; established guidelines for the proper processing of new business; wrote underwriting processing procedure manuals and was responsible for underwriting operations. I established a training program for the training of over 1200 claims technicians, wrote the training procedures manual on claims handling and coverage evaluation and developed a Home Office Claim Department to oversee the day to day technical responsibilities of the company.

In 1992 I assumed the position of Senior Vice President. In that position I established the Audit Practices Group to monitor high exposure claims. I also established an agency audit program, which I personally led, that reviewed the practices of independent agents in their writing of personal and commercial insurance policies for Trust Insurance Company. I have taught more than 100 classes on commercial property claims handling and insurance policy interpretation and the claims handling necessary for policies with coverage questions. I have given talks to brokers and agents on how to underwrite contracts when a proposal is received and what they, as the broker, must review.

From 2000 to 2001, I was employed by Ladd Financial Group, Inc., who owned New England Fidelity Insurance Company. In the capacity as Vice President of Claims for New England Fidelity, I wrote the claims procedure manual, established a claims audit program for all claim's coverage and established authority levels for paying and denying claims.

2

From 2001 to the present, I have been employed by CT Development, LLC., and myself as an insurance consultant. In that capacity, I have represented Liberty Insurance Company at hearings before the Massachusetts Commissioner of Insurance; examined insurance companies for compliance of standards and procedures for the State of Vermont Insurance Department; testified at trials as to usual and customary accepted insurance practices; provided insight into claims and insurance policy issues for law firms; evaluated insurance company procedures and provided guidance for proper claims handling.

Over the past 25 years I have made decisions in the interpretation of large commercial claims brought by policyholders under their commercial property policies. I have personally handled thousands of commercial policies where issues of payment have been in question and I have been the responsible claims authority for hundreds of law suits involving commercial property claims. I have evaluated coverage issues for insureds involving claims occurring in Mississippi and I was the responsible party for granting and denying coverage when those issues arose.

See attached Exhibit 1. as my CV describing my experience.

**Qualifications**
- I am a Massachusetts Insurance Agent, licensed to sell personal and commercial lines of Insurance.
- I am a licensed Public Adjuster in Massachusetts.
- I have conducted seminars for insurance staff and attorneys on coverage and operational issues.
- I am a Charted Property Casualty Underwriter (CPCU) earning my designation in 1980.
- I am an instructor at the Massachusetts Insurance Library teaching Insurance Operations and CPCU courses on coverage, risk management, ethics and insurance operational issues.
- My titles within the insurance industry have included claims adjuster, supervisor, national examiner, claims manager, vice president and senior vice president of claims, senior vice president of operations, resident individual producer and public adjuster.

3

**Present Assignment**

I have been retained by the insured (defendant and plaintiff New Palace Casino, LLC.) to review their commercial property claim and other damages brought against their insurer (plaintiff and defendant, RSUI Indemnity Company) as a result of the hurricane Katrina, named by the National Weather Service as one of the worst storm on record, that struck the Mississippi coast and the gulf coast states, on August 25, 2005. I am being compensated at a rate of $275.00 per hour for this review, $350.00 per hour for deposition and trial testimony and I have no financial interest in the outcome of the litigation.

I have been asked for my opinion regarding insurance industry practices relating to the handling of insurance policies, the claims these policies insure against and the obligations of those who write the policies for the interest of its insureds. My curriculum vitae regarding my education, training and experience, is incorporated herein. My opinions will be based on my employment, experience, education and training in the insurance industry based upon reasonable and prudent claims practices.

**Parties:**
- New Palace Casino, LLC (Palace) is a limited liability company organized under the laws of Mississippi with its principal place of business in Biloxi, Mississippi.
- RSUI (Insurer) is a New Hampshire surplus lines insurance company authorized to do business in Mississippi with its principal place of business in Atlanta, Georgia.
- 

**In my review of the claim I have been provided with the following material:**
1. The original declaratory complaint of RSUI Indemnity Co. versus New Palace Casino LLC., and a counterclaim of New Palace Casino versus RSUI Indemnity Co.
2. Essex Insurance Company, policy ESP 3635
3. Westchester Surplus Lines Insurance Company, policy D35877046 003
4. RSUI Indemnity Company, policy NDH 341888
5. Various pleadings and answers, motions, defenses and responses to various motions.
6. Dr. Keith G. Blackwell, report of August 10, 2008

4

7. Moran Engineering report of August 12, 2008
8. Kevin Kennedy Associates report titled appendix B.
9. Hurricane Katrina deployment summary dated November 16, 2006, received by insured January 3, 2007.
10. Appendix D.
11. Technical Recovery Solutions report dated July 24, 2008.
12. The Austin Company report of the Palace Casino damage assessment.
13. Kevin Kennedy and Associates Inc. report( KKIA) logical analysis of hurricane Katrina wind and storm tide dated July 23, 2008.
14. Michael J. Brandenberg, RSUI's expert designations and reports.
15 E-mails and letters between RSUI and its vendors including its adjustment firm Eagle Martin and Associates Inc.
16. The initial accord report dated August 30, 2005
17. Global Maritime report dated October 14, 2005 and adjusted loss estimate worksheet data dated September 13, 2006
18. Photographs identified as taken by Eagle Martin and Associates Inc., dated September 2005 of damage to the insured property.
19 Photographs identified as taken by Eagle Martin and Associates on the insured's damaged property dated August 29, 2005.
20. Field investigation report dated September 11, 2005 from the Austin company on the loss in question.
21. Eagle Martin, Palace Casino report and estimates dated November 22, 2005 and December 4, 2007 of the various buildings at the casino.
22. Various e-mails from Jeffrey F. Ciaramella, executive General adjuster for Eagle Martin and Associates Inc. to RISU and others working on the Palace Casino loss.
23. Haag Engineering company report dated November 14, 2005.
24. Various e-mails from and to David Teasdale to and from Emily Mc Donald.
25. Photographs under an Eagle Martin and Associates letterhead dated August 29, 2005 and September 2005, of the casino barge, inside of the casino and other buildings located at the casino property.

26. An estimate of damage by the Austin company showing flood damage of $47,887,835 and wind damage of $6,338 983 prepared on September 13, 2005.
27. Tropical cyclone report hurricane Katrina 23 -- 30 August 2005 by Richard Knabb, Jamie Rome and Daniel Brown, National Hurricane Center, December 20, 2005 and updated August 10, 2006 with tropical wave history and storm surges, tornadoes, surface observations, facilities and damage cost estimates.
28. A fax to Jeffrey Ciaramella from George Conwell dated December 21, 2005 entitled, "Palace Casino Barge Demolition Removal and Disposal Estimate for the furnishing of labor and materials to demolish the barge.
30. Kevin Kennedy associates report regarding media logical analysis of hurricane Katrina wind and storm tide dated July 23, 2008.
29. Letter from Michael K. Mies July 24, 2008 to Miller PC referring to Palace Casino.
30. National Hurricane Center track of hurricane Katrina August 23 to August 31, 2005.
31. Report from Wind Science and Engineering Research Center Lubbock, Texas updated January 3, 2007 to include additional references.
32. The Austin company report of damages for the Palace Casino July 11, 2008.
33. Causation analysis of casino barge damage from Barnes Engineering Co. Inc., dated July 14, 2008.
34. Analysis of gaming equipment net book value prepared by Brandenberg Garver and Associates March 17, 2006
35. Analysis of detailed assessment in Bothell report by location prepared by Brandenberg Garver and Associates March 31, 2006.
36. Analysis of detailed assessment in Bothell report by location prepared by Brandenberg Garver and Associates, version 2 dated August 28, 2006.

6

**Insurance policies**

There are three insurance policies insuring New Palace. All policies, above the primary, modify their coverages to comply with the coverage issued by the primary (except for flood on the policy issued from RSUI).

The primary layer of coverage was provided by policy number D35877046003, issued by Westchester Surplus Lines Insurance company and had a limit of liability of $23,285,000 on real property/improvements (Hull); $9,162,373 gaming equipment and $5,075,000 for business personal property; with a per loss limit of $5 million per occurrence. This is an all risk policy including flood except for exclusions. The policy has a deductible of $100,000 per occurrence on covered losses except $1 million per occurrence for windstorm/hail for covered losses. There is $1 million flood deductible. Westchester has paid its primary policy limit and is not involved in loss at this time.

The first excess policy is Essex Insurance company of Wilmington, Delaware, policy ESP 3635 and provides comprehensive coverage including flood for damage to the buildings business personal property including floating hull, gaming equipment, electronic data processing and media, furniture and fixtures, office equipment and general contents, sign and walkways as per attached forms. This policy attaches at $5 million and has a limit of $5 million per occurrence. There is $5 million in the aggregate for earthquake and $5 million in the aggregate for flood. This policy has paid its limit and is not involved in the litigation.

The second layer of excess coverage is provided by RSUI Indemnity Company, policy number NHD 341888 for $27,522,373 dollars assuming primary and underlining limits of $10 million per occurrence. This is an all risk except flood policy conforming to the primary (Westchester) policy. Property covered are buildings including floating hulls, personal property including gaming equipment, electronic data processing equipment, furniture, fixtures and all contents are covered for all risk excluding flood and earthquake. There is no definition of flood in the RSUI policy. However, in the answer and defense to the amended counterclaim of the action RSUI Indemnity versus New Palace Casino,

7

RSUI has claimed under the excess physical damage coverage form that their policy requires the maintenance of the primary policy and incorporates the coverage of the primary policy. The following is quoted from the policy:

This policy is subject to the same, terms, and conditions except as otherwise provided here in... as are contained in... the policies of the primary insurer prior to the happenings of a loss for which claim is made hereunder.

 A. covered cause of loss when special is shown in the declarations, covered cause of loss means risks of direct physical loss unless the loss is:

  1. Excluded in section ...

 B. Exclusions

  1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss

..........

  G: Water

   (1) flood, surface water, waves commerce title, tidal waves, overflow of any body of water, or their spray, all of whether driven by wind or not:

..............

Flood coverage endorsement

 C: Additional covered courses of loss

The following is added to the Covered Cause of Loss; Flood, meaning a general and temporary condition of **partial or complete inundation of normally dry land areas due to**: (emphasis added)

  1. The overflow of inland or tidal waters;
  2. The unusual or rapid accumulation of runoff or surface water from any source: or

8

3. Mudslides or mudflows which are caused by flooding as defined in C..2 .above. For the purpose of this covered course of loss, a mudslide or mud flow involves a river of liquid flowing mode on the surface of normally dry land areas which when the earth is carried by a current of water and deposited along the path of the current.

All flooding in a continuous or protracted event will constitute a single flood.

Under the terms of the Westchester primary policy, loss or damage caused by water, waves, tides tidal waves or spray whether driven by wind or not is not covered. Further any such loss or damage is excluded regardless of "any other clause or event that contributes concurrently or in any sequence to the loss." Thus, to the extent that the cause of loss is water other than flood (i.e. water that does not inundate normally dry land areas) no liability attaches under the Westchester primary or RSUI access policy.

**Facts**
- On August 29, 2005 Hurricane Katrina struck the Mississippi Gulf Coast.
- This devastating storm killed hundreds of people in Mississippi and caused billions of dollars in damage.
- New Palace suffered extensive building damage to the casino barges, hotel and parking garage as a result of the storm.
- At the time of the loss the State of Mississippi required that casinos be located on the water in order to qualify for a gambling license.
- The casinos were located in the water on barges.
- Damages as a result of hurricane Katrina to the casino, parking garage and hotel exceeded $60 million
- The primary and first layer of excess have paid their policy limits of $10 million.
- On the referenced policy RSUI has paid $13,821,886 of their policy attributing 77.2% of the damage to flood and 22.8% to wind.
- A review of their file shows no assignment of loss attributed to perils other that flood and wind.

9

- RSUI has used no other reason other than their exclusionary language for flood for not paying the rest of the insureds damages up to their policy limit.
- RSUI, through the direct contact with the insured and through its attorneys, has declined further property damage payment stating that they did not have flood coverage and have based their payment solely on their claimed estimate of wind damage.
- The RSUI policy does not cover flood, however the policy does not define flood and by their own admission, the language of the primary policy is the controlling language of policy covered losses.
- There is no controversy that the casino barges were on the water at the time of the loss.
- There is no controversy that the policyholders damage exceeds all of the insurance policy limits at actual cash value and or replacement cost.
- In 2005 and 2006 the company's adjustment staff agreed that the barges were beyond repair and had to be demolished.
- There is no definition of actual cash value in any policy involved in the loss.
- RSUI's adjustment firm has not clarified how they arrived at depreciated values for the damaged contents and real property.
- The first time was 2008 when an issue arose that the policyholder's barges that the casinos were based on did not need to be replaced, on this 2005 loss.
- RSUI damage assessment in 2005 noted the total value of the insured's loss exceeded $60,000,000.

**Issues**

As indicated, RSUI has declined further payment for damage sustained by the policyholder as their evaluation is that damage was not caused by wind, but rather flood which, in their opinion, is excluded on their policy.

RSUI has caused the policyholder added expense to their loss by delaying full payment of the damages and unnecessarily requesting court action where an obvious reading of their policy clearly shows coverage for the barge.

10

You cannot arbitrarily assign an exclusion to damage of the barge and casino when a reading of the policy language clearly shows coverage for all the barge and casinos damage

In the summer of 2008 a new point of contention arose in that the barges that were initially declared totally damaged were repairable and that temporary barges could have been used to mitigate already made payments attributed to wind damage.

**Opinion**

It is my opinion that RSUI has intentionally failed to honor the policy that the insured bought and they sold for the damages suffered by insured

- RSUI has no flood definition in its policy and in citing the definition of Westchester's primary policy they have failed in basic reading of the definition of flood. The definition of flood as defined in Westchester's policy states, "flood, meaning a general and temporary condition of partial or complete inundation of normally dry land areas."
- The barges were in the water and certainly not on dry land and flood damage does not apply to the barges. It is obvious that wind pushed the water across the bay and lifted the barges and casinos off their dolphins thus causing them to suffer damage.
- While acknowledging that the damage exceeds some $60 million to the insured's property, there can be no denial or assignment to flood to the barges and casino damage as they were not damaged by flood as defined in the policy.
- In the summer of 2008 when RSUI brought up the possibility that the insured had acted quickly in totally demolishing the barges when other barges were available for rental. This is simply absurd and nothing more than a negotiation tool to limit damages and falls outside of the realm of usual and customary good claims practices.
- The evidence is clear that full coverage should apply for the insured damages it suffered as a result of Katrina including 100% coverage to the barges and their commercial casino structures from the storm as a result of the severe wind damage they suffered
- It is my opinion that RSUI is improperly interpreting and using its flood exclusion. No one argues that the barges holding the casino were in the water. There is no question that the exclusionary language for flood as defined as a general and temporary

11

- condition of partial or complete inundation of normally dry land from the overflow of inland or tidal waters. In the absence of exclusionary language to exclude damage to the barge than damage to the barge in its holdings is covered, because they were over water, not land, and it is not separately excluded under the RSUI policy.
- I am not disputing property damage over dry land at the insureds location because of flood, but damage caused to the barges when pushed off their dolphins by the high wind would be covered as it was the wind that caused the damage, not flood.
- With damages exceeding $60 million, RSUI's position is untenable. In its attempt to avoid paying damages suffered by the policyholder when coverage is clear and unambiguous, they are demonstrating that they are not handling the claim in good faith.
- A review of the claims file in reports of discussion between the company and its field adjusters show only flood (some 77% of the loss) as the reason for not paying that portion of damage to the casino.
- There was no reasonable basis for RSUI to deny the insured's claim under its insurance policies except to protect its own pocketbook.
- Insurance is a promise to "be there for the policyholder" and to pay damages incurred when the need arises and not to look for reasons to deny that are groundless and arbitrary.
- Since it is my belief that further information may be produced shortly I reserve my right to amend my opinion as discovery continues.

**Summary**

Hurricane Katrina was a horrible storm and the damage was devastating. To use flood as a reason for denial of damage to the barges, and their floating casino, is just wrong and not what the policy covers. In the RSUI declaration page for the description of the covered property they clearly state they are covering the barges. To try and limit a company's exposure by misreading a policy is bad claims handling and just wrong.

There is no question that full damage coverage applies to the barges.

12

Signed _(signature)_

Paul F. Amoruso CPCU

Dated: _March 17, 2009_