IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DIVISION


RSUI INDEMNITY COMPANY
    PLAINTIFF/
    COUNTER-DEFENDANT

VERSUS                                    CIVIL ACTION

NEW PALACE CASINO, LLC                    NO. 1:07cv893-LG-JMR
    DEFENDANT/
    COUNTER-PLAINTIFF




Deposition of PAUL F. AMORUSO, CPCU, taken at New Palace Casino, 231 5th Street, Biloxi, Mississippi 39530, on Monday, June 15, 2009, at 10:00 a.m.




By:  Ashlee B. Ancalade

Registered Professional Reporter


# Exhibit 2

```
 1              A P P E A R A N C E S
 2    Representing New Palace Casino, LLC:
 3    Zachary & Leggett, PLLC
      BY:  PATRICK H. ZACHARY, ESQ.
 4    121 South 29th Avenue
      Suite 100
 5    Hattiesburg, Mississippi 39402
      601.264.0311
 6
      Representing RSUI Indemnity Company:
 7
      Galloway, Johnson, Tompkins, Burr & Smith
 8    BY:  FREDERICK W. SWAIM, III, ESQ.
      701 Poydras Street
 9    Suite 4040
      New Orleans, Louisiana 70139
10    504.525.6802
```

```
11              I N D E X
12    Caption                                    1
13    Appearances                                2
14    Agreement of Counsel                       3
15    Examination
16       Frederick W. Swaim, III           4, 282
17       Patrick H. Zachary                   280
18    Witness' Attestation                    285
19    Reporter's Certificate                  288
20              * * * * * *
21    Exhibits
22    No. 1  Curriculum Vitae                   9
23    No. 2  Website printout                  45
24    No. 3  Billing information               77
25    No. 3  Expert Report                    178
```

1                    S T I P U L A T I O N

2

3          It is stipulated and agreed by and among

4    Counsel that the deposition of the aforementioned

5    witness is hereby being taken under the Federal

6    Rules of Civil Procedure for all purposes in

7    accordance with the Rules.

8

9          That the formalities of reading and

10   signing are hereby not waived.  The formalities of

11   sealing and certification and filing are hereby

12   waived.  The party responsible for service of the

13   discovery material shall retain the original.

14

15         All objections are to be made in

16   accordance with the Rule of Civil Procedure.

17

18

19              *  *  *  *  *  *  *  *  *  *

20

21         Ashlee B. Ancalade, Registered

22   Professional Reporter, in and for the State of

23   Louisiana, officiated in administering the oath to

24   the witness.

25

1          PAUL F. AMORUSO, CPCU
2          8 Old Mattapoisett Neck Road,
3     Mattapoisett, Massachusetts, 02739, after having
4     been first duly sworn, was examined and did
5     testify as follows:
6               E X A M I N A T I O N
7     BY MR. SWAIM:
8          Q     My name is Fred Swaim.  I represent
9     RSUI Indemnity Company in connection with this
10    claim.  Could you please state your full name
11    for the record?
12         A     It's Paul F. Amoruso, A-M-O-R-U-S-O.
13         Q     What is your residential address?
14         A     8 Old Mattapoisett Neck Road,
15    Mattapoisett, Massachusetts.
16         Q     Is that also your business address?
17         A     My business address is 34 Barstow
18    Street, Mattapoisett, Massachusetts.  I have
19    an office at my home and also on Barstow
20    Street.
21         Q     Okay.  Have you given a prior
22    deposition before?
23         A     Yes.
24         Q     So I'm assuming that you are
25    familiar with the ground rules, but I will

1   just lay out a few things just to be clear.

2   Essentially, this is just a Q-and-A session.

3   I am going to ask you questions.  All I expect

4   from you is that you answer honestly and

5   verbally for the sake of the court reporter.

6           If for any reason you need a break

7   or anything like that, just let me know.  It's

8   absolutely no problem.  Do you have any

9   questions for me?

10       A    No.

11       Q    Mr. Amoruso, what did you review in

12   connection with today's deposition, in

13   preparation for today's deposition?

14       A    I reviewed all of the files,

15   material that's stated in my report.  Plus

16   what counsel is going to read now, the

17   additional material.

18       MR. SWAIM:

19           Okay.

20       MR. ZACHARY:

21           Billy, as we discussed before we

22   went on the record.  The amended answer to the

23   counterclaim that was filed by RSUI.

24       MR. SWAIM:

25           Uh-huh (positive response).

1        MR. ZACHARY:

2           I had provided that to Paul after

3 his report was rendered, a complete copy of

4 the claims file, which probably most of it was

5 reviewed by him already, but it had not been

6 identified as such until I think Koski's

7 deposition or maybe after Jeff Ciaramella's.

8 But I've also sent him depo transcripts of

9 Jeff Ciaramella's depo, Mike Koski's depo,

10 Keith Blackwell's depo, Woody Allen and Amir

11 Tavakoli from Austin Company. The Yates

12 estimates and repairs.

13        MR. SWAIM:

14           I'm sorry, Pat, could I get the

15 depos again?

16        MR. ZACHARY:

17           Yeah. It's Ciaramella, Koski

18 (assumed spelling), Blackwell, Woody Allen,

19 Amir Tavakoli from Austin Company.

20           That Yates estimate repair sheet

21 that we sent to previous counsel back in

22 October of '07. The Wood's Special Risk

23 Broker underwriter underwriting file that was

24 produced pursuant to subpoena to you-all.

25        MR. SWAIM:

1           Uh-huh (positive response).

2      MR. ZACHARY:

3           A copy of an e-mail.  I know he

4      identified several e-mails, but he didn't have

5      an e-mail from Mike Koski to George Conwill,

6      C-O-N-W-I-L-L, dated June 21, '07, and Terry

7      Moran, I'm sorry.

8      MR. SWAIM:

9           Depo transcript?

10     MR. ZACHARY:

11          Yeah.  I should have added him.

12     MR. SWAIM:

13          Okay.  Anything else?

14     MR. ZACHARY:

15          Not that I have purposefully

16     omitted.

17     BY MR. SWAIM:

18     Q    I am going to ask you a couple of

19     questions in a little while about those

20     documents.  But in connection with today's

21     deposition, you basically went through and

22     just reviewed your entire file?

23     A    Yes, sir.

24     Q    Did you have any meetings or

25     conversations with anyone other than counsel?

1       A     I met with George Conwill this
2   morning.
3       Q     Okay.  What did you-all discuss?
4       A     We talked about what happened to him
5   from just before the storm until probably
6   around December, January '06.  General
7   conversation as to what -- what happened with
8   him, how he met people, what he did, what his
9   impressions and interpretations were.
10      Q     Did anything that you discussed with
11  Mr. Conwill this morning affect your opinions
12  in any way in connection with your report?
13      A     No, sir.
14      Q     Okay.  Now, do you have an updated
15  C.V. with you, Mr. Amoruso?
16      A     I do.  It's the same one -- well,
17  let's see if it's the same one.
18      Q     Let's see.
19      A     If it's got the Barstow Street
20  address on it, it's possibly the last one.
21  That's about a year old.
22      Q     Okay.  Yeah.  This one has that
23  address as well.  Okay.  And this is a current
24  copy of your curriculum vitae?
25      A     Yes, sir.

1          MR. SWAIM:

2              I would like to attach that as

3      Exhibit 1 assuming there are no objections.

4          MR. ZACHARY:

5              No.  And that does have the spelling

6      of the Mattapoisett, Massachusetts, for the

7      court reporter's benefit.  I saw her cringe.

8              (Exhibit No. 1 is marked.)

9      BY MR. SWAIM:

10         Q    Mr. Amoruso, could you give me a

11     narrative of your educational background?

12         A    I graduated from Providence college

13     in 1969.  That's my last schooling, really, so

14     to speak.

15         Q    What was your degree in?

16         A    Social studies, liberal arts.

17     Everything else becomes insurance specific

18     after that.

19         Q    Okay.

20         A    In courses that I designed and/or

21     created.  Do you want me to go through that?

22         Q    Please.

23         A    I started working for Liberty Mutual

24     in -- well, I went in the Army after I

25     graduated from college.

1      Q     Okay.  What division?

2      A     Engineers.

3      Q     What did you do in the Army?

4      A     I was combat engineer.  I think I

5   was 30(b)(6) -- no.  10B40, I think, they

6   called it, combat engineer.

7      Q     But you had no prior engineering

8   background?

9      A     No.  The Army is glad to teach you

10   all you need to know.

11      Q     That's specific to weapons?

12      A     Building roads and shooting things

13   down and blowing things up.

14      Q     Okay.  It's not about design of

15   buildings --

16      A     No.

17      Q     -- forensic work regarding

18   causation?

19      A     No.  Other than building outhouses.

20      Q     How long were you in the military

21   for?

22      A     I stayed in ten years.  I was in

23   active duty six months, but I chose to stay in

24   until -- for another nine years and six

25   months.

1      Q     So roughly from '69 to '79?

2      A     Yes.

3      Q     Okay.  Why don't we just combine any

4  remaining educational background with the

5  employment background as well.  Because that's

6  going to be my next question to you.  So let's

7  just try and get a timeline.  So '69 to '79 --

8  you graduated in '69, to '79 you were in the

9  military?

10     A     I was in the military part time.  I

11 was in the reserve.

12     Q     Okay.

13     A     I started working for Liberty

14 Mutual -- can I have my C.V.?  I need to

15 follow that.

16     Q     Sure.

17     A     Wait a minute.  You have to go

18 backwards on this.  I started working for

19 Liberty Mutual.  I was hired in December of

20 '69.  And I was assigned as an all line

21 casualty claims adjuster in Fitchburg,

22 Massachusetts.  I stayed there for about five

23 months.  I got transferred to Bridgeport,

24 Connecticut, as an all line claims adjuster.

25     Q     When you say "all lines," what do

1    you mean?

2         A    You handle every part of the

3    casualty business that Liberty wrote --

4    property, automobiles, workers' comp.  And

5    whatever claim came in your territory, you

6    got.

7         Q    So it includes first-party property

8    claims?

9         A    First-party property claims.

10        Q    Okay.  So you transferred after

11   about five months to Connecticut?

12        A    To Connecticut.  And I became the

13   property specialist in Connecticut.

14        Q    What does that mean?

15        A    That means I handled all of the

16   property losses for Southeast Connecticut for

17   Liberty Mutual.  Any commercial loss and any

18   residential loss over $5,000.

19             I stayed on that project -- I went

20   to Vale Tech and was trained there as a

21   property adjuster back in '71, '72, in that

22   realm.

23        Q    And how were you trained?

24        A    I was trained to write building

25   estimates, compute damages, understand

1    damages.   There was a six-week course.

2         Q     So it's the front end and the back

3    end?

4         A     Front end and the back end of a

5    property loss adjustment to creating the

6    appraisal to issuing the check.

7         Q     Okay.

8         A     They needed a -- what they called a

9    trial person at the same time, so I took on a

10   dual role.   I was still their property man

11   handling just commercial losses, but I became

12   a trial adjuster.   I believe that was '74.

13        Q     What does a trial adjuster do?

14        A     Trial adjuster was in charge of

15   prepping trials and following trials for their

16   results, attempting to compromise them, if

17   necessary, settle them, or take the verdict

18   and do what you needed to do if you won or

19   lost.

20        Q     You would have input into the legal

21   strategy; is that correct?

22        A     Attorneys don't run claims

23   departments.   We make the judgments.   I was

24   the one who gave the attorneys money if I

25   wanted to settle it.   I was the one who said

1    we can pay it or deny it.  If we wanted to

2    deny it, we went from that point forward.

3         Q    So is it fair to say that your

4    duties remained the same with the exception of

5    the claims that you began to handle were more

6    closely related to litigation?

7         A    To litigation, yeah.  I still had to

8    handle large property claims at the same time.

9    I had to make time for both.

10        Q    Okay.  Did you ever give any

11   opinions or advice on how the attorney should

12   handle the case?

13        A    Again, the attorneys did what I

14   instructed them to do.  If we wanted to

15   settle, we settled.  If we didn't, we prepared

16   the defense based on what we had and went

17   forward.

18        Q    But what I'm saying is, you would

19   contribute to preparing a defense in some way?

20        A    Yes, sir.

21        Q    Okay.  In what way would you

22   participate in that aspect?

23        A    By giving them my opinion to decide

24   what I wanted to do and what I didn't want to

25   do.

1        Q     Okay.  Did you become involved in
2   the actual -- in the legal concepts and the
3   actual trial prep stuff?  Or was it just
4   recommendations as far as numbers and this and
5   that?
6        A     I was the trial prep person to find
7   the witnesses, make sure they understood their
8   role, get them there to court, met with them
9   with the attorney for trial preparation, or
10  prepped them myself, and follow what their
11  testimony was to be expected.  If it wasn't to
12  be expected, we had to make a change because
13  it wasn't what we thought it was going to be.
14       Q     Were you ever involved in
15  researching any type of laws or jurisprudence
16  in connection with any of those --
17       A     I was not a lawyer.  I didn't follow
18  the law.  I left that to the attorneys to make
19  their recommendation as to what the law was to
20  us.
21       Q     Have you provided any advice in
22  connection with this matter as far as the
23  litigation status?
24       A     As far as the litigation?
25       Q     Yeah.

1          A     When you are talking about

2    litigation, I will answer saying that I'm not

3    a lawyer.  I offer opinions as what I call an

4    OCG, an old claims guy.

5          Q     Okay.

6          A     I give them the person that makes

7    the decision.  I eventually rose -- and we'll

8    get to that in a while -- to the level of

9    senior vice president of claims.  And I was

10   the final authority giver when people would

11   come to me.  The lawyers would come to me.

12   The adjusters would come to me.  Someone would

13   come to me for money or a position.  I would

14   say yes or no.  I could agree with it or I

15   didn't have to agree with it.  I could do what

16   I wanted.

17              In the insurance world, that's who

18   makes the real decision, the person who

19   controls the purse strings.

20        Q     So what about like if your guys were

21   preparing to depose someone?  Would you meet

22   with the attorney or something and go over

23   some possible questions that you wanted

24   answered that you thought were pertinent?

25        A     Depending on the level I was at, I

1    would make sure I got the answers to the

2    questions that I wanted to see.

3         Q    Okay.

4         A    If they didn't have them -- if I

5    knew them already, I didn't have anything.

6         Q    Have you done that in this case

7    beyond your report, provided Mr. Zachary with

8    any advice or recommendations as far as

9    questions and depositions or for possible

10   strategies or anything like that?

11        A    I have done no depo prep during the

12   course of this litigation.

13        Q    Okay.  Where did we leave off?

14        A    I have to think where I was.

15        Q    '74?

16        A    I was in Bridgeport, Connecticut, in

17   '76.  I then transferred to the Providence

18   office of Liberty Mutual as all line claims

19   supervisor.  I headed a unit of -- there was

20   about ten total people.  There was five

21   casualty people and some support staff.  And

22   we handled the State of Rhode Island and some

23   parts of Massachusetts for all the gamut of

24   the casualty fields, whatever came into our

25   territory that fell in my alphabetical split,

1  we handled.

2          Stayed there until '78.  '78 to

3  late -- middle '79, I guess, I went to Liberty

4  Mutual's home office as a casualty adjuster.

5  And I handled products liability cases,

6  specifically burn cases in all 48 states and

7  Hawaii and Alaska, plus territories that

8  Liberty tried cases in.

9          Q    And that was as a claims examiner?

10         A    Casualty claims examiner.

11         Q    Okay.  And were those more general

12  liability type cases or property cases?

13         A    Most of those were property burn

14  cases.  I handled five states for all loss,

15  Oklahoma, Colorado, Arkansas, Kansas --

16  Kentucky, Iowa and Minnesota, for claims of

17  automobile and commercial liability.  No

18  property in that gamut.

19         Q    Okay.

20         A    Stayed there until '70- -- late,

21  middle '79.  Then I took over an office for

22  Liberty as a claims manager in New Bedford,

23  Massachusetts.

24          In 1980, I earned my CPCU

25  designation, which is a chartered property

1    casualty underwriter designation.

2        Q    What did you have to do to obtain

3    that?

4        A    At that time, it was switching from

5    five to ten courses.  So I took a number of

6    courses, at least five but less than ten

7    because they were switching over to the amount

8    you needed.  They were yearly and six-month

9    exams.

10            I think three -- I think I took

11   three courses where they had one exam that

12   covered two parts.  And then later on there

13   was four exams, maybe -- yeah, I think there

14   was four, that were like six months.  They

15   were splitting the older topics apart.  So I

16   took an exam in January and then took another

17   one in June.  There was ten total.  Ten exams

18   worth of credit needed.

19       Q    Okay.

20       A    I passed -- I took that designation

21   on.  Became claims manager of the Bridgeport

22   office.  That was all line casualty claims

23   office.

24       Q    What year?  I'm sorry.  What year

25   are we at now?

1    A    That is 19 -- late -- I think

2   January 1st, 1980.  I was probably there in

3   December of '79 or something like that.

4    Q    Okay.

5    A    I stayed there until -- the office

6   grew, but I think I had 18 -- 22 people when I

7   got there.  And there was a couple hundred

8   when I left.  We grew a lot during the nine

9   years that I was there.

10        Again, it was every casualty field

11  that could be from large fires to hurricanes,

12  tornadoes.  You name it, we had it.  It hit

13  New England, it hit my area.  I handled -- I

14  handled Cape Cod and half of -- the southern

15  part of Massachusetts.

16    Q    Approximately, how many hurricane

17  claims would have been involved in that?

18    A    I think we did at least four that

19  hit my area at that time.  I got a call from a

20  man one day, and I met him in a parking lot.

21  And that was in 1989.  And he was forming an

22  insurance company.  And I left Liberty, and I

23  went to work for a man who was forming an

24  upstream holding company known as "Trust

25  Group, Inc."

1      Q    Can I stop you for just one second?

2      A    All right.

3      Q    If we could, let's go back to 1980

4    when you say that you were working those

5    hurricane claims in the New England area, did

6    those involve wind versus wave determinations,

7    causation determinations?

8      A    There were some.

9      Q    There were?

10     A    Yeah, there were some.

11     Q    There were?

12     A    Yeah, there were some.  Mostly --

13   flood really started to become an issue back

14   in the '60s.  We had trouble with the

15   definition of where -- the way the winds were

16   coming.

17          When I worked for Liberty between

18   '70 and up until the time I became a

19   supervisor, I was a casualty claims adjuster

20   with property loss.  I did at least four,

21   maybe five casualty assignments.  Three of

22   them were for tornadoes and two were for

23   hurricanes where Liberty sent a disaster crew

24   into an area.  I went to Florida -- or stayed

25   in Boston and managed the claim from the

1    Boston office.  So those were disaster teams

2    that I was a part of.

3        Q    Okay.

4        A    And there is an issue of whether or

5    not -- coverage is always a possibility as an

6    issue, but we never really seem to see a lot

7    of it.  We had commercial and personal claims

8    in both of those areas.

9        Q    Okay.  That takes, what, to about

10   1989?

11       A    In '89, I met a man.  We formed a

12   holding company known as "Trust Group, Inc."

13   Trust Group, Inc, it's an upstream holding

14   company that was forming an insurance company,

15   at least one at that time known as "Trust

16   Insurance Company."

17       Q    Uh-huh (positive response).

18       A    Trust Insurance Company started off

19   initially as an automobile company.  And for

20   the first year and a half, that's all we were.

21   We became a full line casualty company later

22   on.  And we finished -- we were about the

23   fifth largest in Massachusetts.  I became

24   their vice president of claims, senior vice

25   president of the group.  And I stayed with

1    them until '99.

2          Q     And you worked solely for Trust at

3    that time?

4          A     I worked for Trust and it's

5    entities.  I started a company known as "Trust

6    Integrity."  That was a fraud operation.  We

7    were going to use computer research to find

8    fraud for the federal government.

9          I left claims operation pretty much

10   in '98, working almost full time as -- I

11   started my company of Trust Integrity within

12   the group ladder.

13         Q     What did you do with trust and their

14   other entities?  I mean, was it along the same

15   lines as the work you had been doing with

16   Liberty Mutual, same type of claims guy?

17         A     No.  I was the senior vice president

18   of claims.  I hired the people.  I trained

19   them.  When I started, there was me.  And I've

20   conducted well over more than 100 training

21   sessions for individuals.

22         I hired them.  I trained them.  I

23   created their positions.  I created their

24   claims procedures.  I did everything you

25   needed to do to make a company start from day

1    one.  And I also was the claims authority on

2    issues.  I had the highest -- I was the claims

3    person that had the total payment or denial

4    authority on any issue for them for the next

5    ten years.

6         Q    Again, you said this was in

7    Massachusetts?

8         A    This was in Massachusetts, right.

9         Q    Okay.  And what happened with Trust

10   Insurance Company?

11        A    Trust Insurance Company went away.

12   I left them in '99.  The owner took the money

13   really that we had surplussed and threw it

14   into a computer system he wanted.  And the

15   commissioner of insurance didn't like that as

16   receivable.  He was counting it as a

17   receivable, and he took all of the cash and

18   bought a -- built a computer system under the

19   AIG auspices.  And they didn't like that as a

20   financial move.  So they became

21   undercapitalized.

22        Q    How was AIG involved?

23        A    AIG became Trust Computer Company.

24   They have lots of entities.  And they designed

25   with our people and myself the claims system

1    that actually runs AIG now.

2            The AIG claim system was a system

3    that I designed as the senior VP of claims.

4    Their techies turned it into dots and O's and

5    dashes and became the AIG system which runs

6    their organization today, so to speak.

7            Q    Okay.

8            A    Because they ended up with it as a

9    receivable when Trust Insurance Company went

10   kaput in 2000.

11           Q    Okay.  Did you have any -- were you

12   involved with the commissioner in any way in

13   his discipline of that other individual you

14   were referring to?

15           A    The owner?

16           Q    Yeah.  I'm assuming that -- you said

17   the commissioner didn't like it.  I am

18   assuming he had some type of --

19           A    He unfortunately didn't face any

20   problems.  I worked for the commissioner.

21   When I left Trust, I lasted about -- I don't

22   know, a little while without a position.  And

23   then she hired me to run another company that

24   was in financial need out in Springfield.

25           Q    I'm sorry.  Okay.  You are talking

1    about the commissioner?

2        A    I worked for the commissioner of

3    insurance for about the next ten months for a

4    company known as -- I've got to look.

5        Q    We are still around the '99, 2000

6    time?

7        A    Yes.  Oh, the company that was -- it

8    was Ladd financial owned company known as New

9    England Fidelity.  That was around 2000.  She

10   hired me to run their claims operation and be

11   their operations person.

12       Q    Okay.  So you weren't disciplined in

13   connection with the Trust Insurance Company or

14   it's entities by the commissioner?

15       A    No.  No.

16       Q    Okay.

17       A    There was no discipline for anyone.

18   What Mr. Bradley did was not illegal.  He just

19   claimed it as a bad business practice.  The

20   money was still there.  He took the

21   $38 million that we had and he created a

22   computer system.  There was no disciplinary --

23   as much as I would have thought that was a bad

24   move, my opinion didn't really count.

25       Q    The money was gone at that point.

1      A      The money was gone and was spent.

2   And they did have something for it that was

3   valuable.  Again, that system ended up being

4   owned.  AIG and the commissioner cut a deal

5   for outstanding debt and the commissioner of

6   insurance gave it to them.

7      Q      Did you ever assert any type of

8   claim in connection with that situation?

9      A      No.  I needed money to bring that

10  up.  I worked for Trust Group.  I still work

11  for them today.  The upstream holding company

12  then brought me back in supposedly to get paid

13  some day.  That was back in 2000.  And

14  basically hired me to recover any available

15  funds from people like Mr. Bradley or anyone

16  else.

17          And I work for them today.  I am

18  working them through bankruptcy.  And the last

19  thing we have to do is get rid of an employee

20  ESOP that the government is actually working

21  on our behalf to try to get rid of.

22          You have got the department of labor

23  as our friends owning the ESOP, but the IRS is

24  saying that when they set it up, they didn't

25  do something right.  So it's been held up for

1  a year.  It's the last thing.  I concluded

2  their -- they had huge IRS problems.  I

3  negotiated their IRS problems down to where

4  they should have been.  And the receiver ended

5  up paying those.  That was the receiver's

6  issue.

7        Q    AIG is still involved --

8        A    AIG is gone.  AIG is gone.  They own

9  the computer system, and they are using it

10  themselves.  Trust is not using that system.

11  While the company may still be operating, they

12  are using other systems.

13        Q    So that takes us up to about '99,

14  2000.  But you said -- just to go a little bit

15  further -- that you still do work for one of

16  those Trust entities?

17        A    I work for the holding company,

18  Trust Group, Inc.

19        Q    Okay.

20        A    The people that owned everything

21  hired me to run their business.  And although

22  I never collected $.10 from them -- and they

23  probably have an outstanding of about

24  $500,000.  They don't have money to pay me.

25        Q    You are still working for them?

1    A    I work for them.  The board of
2 directors hired me.  I report to them.  It's
3 five guys.  It's now three.  And I keep them
4 out of trouble.
5    Q    Okay.  What else have you been doing
6 since '99 and 2000?
7    A    2000, I went to work for the
8 commissioner again.  And I ran Ladd Group for
9 a year.  Probably eleven months, ten months.
10    Q    What is that?
11    A    Ladd Group was an insurance
12 company -- was an upstream holding company
13 that owned an insurance company ready to --
14 they had no money.  So I just kept them until
15 the insurance commissioner could find a buyer
16 for them.  That was New England Fidelity
17 Insurance Company.
18    Q    What did they do?
19    A    They were a property casualty
20 company in Massachusetts.
21    Q    You said ten months or so.  That
22 would roughly take us to --
23    A    About February 2001, March 2001.
24    Q    Okay.  What next?
25    A    I started working for myself.  I

1  became a consultant, advising insurance

2  companies, attorneys, and whoever would want

3  to call me.

4            I became a licensed broker to sell

5  casualty insurance.  I think that was 2003.

6  Although I never make any money off of

7  selling.  I run people's offices once in a

8  while for them if they want to go on vacation.

9  You have to have a licensed broker in the

10  office if you are going to sell business.

11           And I still have a lot of friends in

12  the insurance industry.  So I go there if they

13  want to go play golf for two weeks in Florida,

14  I just make my office their office.

15      Q     Uh-huh (positive response).

16      A     I became a public adjuster in 2004,

17  I think, maybe it was '05, 2004, I think.

18      Q     Just so we're clear, the CPCU, what

19  state is that in?

20      A     That's all states.

21      Q     That's all states.  What about your

22  brokers license?

23      A     Brokers license is Massachusetts.

24      Q     What about the PA license?

25      A     The PA license is Massachusetts.

1     Q     All right.  Are you licensed in any
2  other state as a public adjuster?
3     A     No.
4     Q     Are you licensed in any other state
5  as a property and casualty insurance agent, a
6  broker?
7     A     No.  Just in Massachusetts.
8     Q     Okay.  And do you get paid when you
9  watch over these companies like you were
10  referring to?
11     A     No.
12     Q     Nothing?
13     A     Nothing.  I use their office.  These
14  are good friends of mine.  And they have an
15  issue.  I needed an office at the time.  I
16  haven't done it in the last year or so since I
17  got my own office in downtown Mattapoisett.
18  It was comfortable to work in an office rather
19  than work in my small office in my home.
20     Q     What is the name of your company?
21     A     Just me.  Operating as Paul F.
22  Amoruso.
23     Q     As far as income, you said you don't
24  get paid when you watch over those places?
25     A     No.

1      Q    Outside of your business that we're
2   referring to now that's in your name --
3      A    Yeah.
4      Q    -- do you have any other type of
5   income?
6      A    I teach for the insurance library in
7   Boston.  It's the education arm of the
8   insurance industry in Massachusetts.
9      Q    What do you teach?
10     A    All casualty courses.  It's
11  property, casualty, CPCU courses.  Any
12  casualty course -- commercial general
13  liability policy, the brokers licensing.  I
14  teach when they have a need.  I didn't teach
15  this last semester because the insurance
16  industry has cut down.  And they are not
17  having as many classes as they used to.  And
18  some of the instructors there make a living
19  out of this.  I only teach two courses a year,
20  four tops, two in the spring and two in the
21  fall.
22     Q    How much do you get paid?
23     A    It's about $1,300 a course.
24     Q    Anything else as far as income?
25     A    My -- let's see, not working income.

1      Q    Okay.  Are there any other degrees
2    or certifications or licenses that you haven't
3    mentioned?  I'm sorry.  Let's finish up to the
4    present.  Is there anything else that you have
5    done from '99, 2000 up to the present?
6      A    That's what I have done.  Working
7    for Trust Group, I did that a lot.  That might
8    have been 20 hours a weeks up to about a year
9    and a half ago.  But, again, I wasn't paid for
10   that.  I did it because I liked it.
11        And I also taught.  And I've been
12   doing consulting work since 2000.  It's the
13   main source of my income.
14     Q    Okay.  You are still owed
15   approximately 500,000 in connection with your
16   work for Trust or Liberty?
17     A    Well, they owe me that.  I will
18   never see a dime of it.  It's not possible.
19   They don't have any money.
20     Q    What about other degrees,
21   certifications, or licenses that you have
22   received --
23     A    I have none.
24     Q    -- that we haven't already
25   discussed?

1      A    I have none.

2      Q    Have you ever been disciplined in

3    any way by any state, federal, or local board

4    in connection with any of your licenses or any

5    other fashion?

6      A    No.

7      Q    Just to be clear, you're not an

8    attorney?

9      A    No.

10     Q    You are not a licensed engineer?

11     A    No.

12     Q    You are not a construction

13   consultant in any way?

14     A    You have to define "construction

15   consultant."

16     Q    Well, would you consider yourself to

17   be -- how would you define "construction

18   consultant"?

19     A    Well, I'm quite capable of making a

20   decision on what the appropriate way is to

21   repair a building.  So am I going to go out

22   and bill myself as a construction consultant,

23   no.  Am I going to say that's the appropriate

24   thing to do in terms of the insurance system,

25   yes.

1      Q    But you would defer to an engineer
2  in that situation?
3      A    I would listen to the engineer.
4      Q    You are not a meteorologist in any
5  form or fashion?
6      A    No.
7      Q    Okay.  What about literature or
8  presentations that you have had?  I know you
9  have already mentioned some projects that you
10  worked on, and I know you teach.  Is there
11  anything else that you can think of, any sorts
12  of literature or presentation that you have
13  generated?
14      A    No.  Other than reports.
15      Q    Reports in connection with your
16  consulting work?
17      A    Yes.
18      Q    Okay.  You don't have any license in
19  the State of Mississippi?
20      A    No.
21      Q    You have never been licensed in
22  Mississippi in the insurance field?
23      A    No.
24      Q    Have you ever been to Mississippi
25  before?

1          A      Yes.

2          Q      On approximately how many occasions?

3          A      More than five.

4          Q      All in connection with litigation?

5          A      Pleasure once, probably five

6     litigation issues.

7          Q      You said that you have been involved

8     with Mississippi claims in the past?

9          A      Yes.

10          Q      Approximately, how many?

11          A      More than ten.

12          Q      How much of that is in connection

13     with Hurricane Katrina?

14          A      Probably nine.

15          Q      Okay.  And the other one?

16          A      I'm trying to think.  There was a

17     reason why I said nine.  Hurricane Alex --

18     that was the last one we had?  What was the

19     last hurricane we had?  The last hurricane, I

20     just did a consulting job for a law firm.  I

21     never created anything for it.  We just talked

22     about it.

23          Q      You are not talking about Gustav?

24          A      Gustav, I'm sorry.

25          Q      Alex, Gustav.

1      A      It was within the last year.  It was

2   an issue regarding the homeowners policy,

3   which they probably don't have enough money to

4   hire me.

5      Q      You haven't generated a report?

6      A      I haven't generated a report, no.

7   We just talked about it.

8      Q      Of those visits in connection with

9   Hurricane Katrina, how many cases are we

10  talking about?

11     A      Cases?

12     Q      Right.  Like did you come here three

13  times in connection with one case, or did you

14  come here nine times all on different claims?

15     A      Probably six.  Three times -- at

16  least twice on one case -- no -- yeah,

17  probably three times on one case, the Hard

18  Rock.  And other cases in my list or cases

19  that don't appear in my list because I never

20  generated a deposition or a -- I never

21  generated a deposition or testified at trial.

22     Q      Before Hurricane Katrina, how many

23  times approximately had you been to

24  Mississippi?

25     A      Once.

1       Q      What was that in connection with?

2       A      Just to see it.  Was drove down --

3   it was a touring trip to go to Florida.  We

4   came through probably mid '80s.

5       Q      Okay.

6       A      I wanted to see the area.  I don't

7   remember the heat, though, that you have got

8   here today.

9       Q      It's pretty rough.  It's only going

10  to get worse too.  I imagine it's quite

11  different in Massachusetts.  Probably still a

12  little warm.

13      A      It's 71 degrees where my house is

14  right now.  And there's no humidity.

15      Q      That's the thing.

16             Just so I'm clear, you said you had

17  been involved in Mississippi claims in the

18  past.  I know we just talked about Katrina.

19  But prior to Katrina, would it be fair to say

20  that the work that -- when you were referring

21  to the work that you did in the '70s regarding

22  products liability or -- I don't know if you

23  said --

24      A      I did work on a number of

25  Mississippi cases on issues involving

1    litigation --

2         Q    Uh-huh (positive response).

3         A    -- between '78 and -- '78 and '79.

4    Probably more than ten, less than 20.

5         Q    And those were the ones that you

6    were referring to as general liability type

7    cases?

8         A    They were issues involving general

9    liability, some property damage.  Usually had

10   something to do with things burning.

11        Q    Any to do with hurricanes?

12   Causation determinations in connection with

13   hurricanes?

14        A    No.  No.

15        Q    Just so we're clear, approximately

16   how many claims have you adjusted in

17   connection with the first-party insurance

18   claims in the State of Mississippi?

19        A    I have not adjusted any.

20        Q    Okay.  I know that you have some

21   information that's provided for on the web?

22        A    Poorly.  But it's there.

23        Q    Well, I have a list --

24        A    I'm sure you do.

25        Q    -- under the topic that says

1    "Services."  And it shows your areas of
2    expertise?
3         A    Uh-huh (positive response).
4         Q    I would like you to take a look at
5    this and confirm that you believe these are
6    your areas of expertise.
7         A    (Views document.)  Yeah.
8         Q    Seems about right?
9         A    Yes.
10        Q    Is there anything else that you can
11   think of beyond that list?
12        A    Oh, yes, I get involved in a lot of
13   things.
14        Q    Well, let's go through some of those
15   things.  And why don't you let me throw out
16   some stuff first, and then if we miss
17   anything --
18        A    Uh-huh (positive response).
19        Q    This may be in connection with other
20   advertisements you have or just areas that you
21   believe you are qualified.
22        A    Well, this probably wouldn't be
23   advertisements or things that I get involved
24   with.  I get calls in just about any issue
25   involving property/casualty insurance.

1    Sometimes it's an opinion.  Sometimes it's a

2    consultation.  Sometimes it's not related to

3    property/casualty, but more in my business

4    sense administratively -- personnel issues.

5    I've done a lot of different things for

6    different people in different parts of the

7    country.

8         Q    Okay.  What about business

9    expertise?

10        A    I don't know what you mean by

11   "business expertise."

12        Q    That's a term that I came across,

13   and I was hoping you could define that for me

14   and let me know whether you think that that is

15   something you are qualified to --

16        A    If it relates to property/casualty

17   insurance, and it's a term -- and you are

18   using it in terms of insurance --

19        Q    Yes.

20        A    -- nomenclature.  Most issues in

21   business relating to insurance I would feel

22   comfortable in discussing.  Some less than

23   others, but some more than others, then I

24   would qualify myself as an expert.

25        Q    What about business interruption?

1      A      Yes.

2      Q      Do you always testify about damages?

3      A      Do I always testify about damages?

4      Q      Yeah.  Is it all in connection with

5  forensic work postcasualty stuff now?

6      A      Accountants will do most of the

7  forensic accounting work.  I look at it from

8  the claims standpoint as to how it relates to

9  the insurance policy and whether or not you

10  can prove what you have got doesn't make

11  sense.

12      Q      Okay.  Workers' compensation?

13      A      Yes.  A lot of that.

14      Q      Of course, property claims?

15      A      Property claims.

16      Q      What about document examiner?

17      A      That -- you are in an advertising

18  website.  We have gone through this before

19  with someone.  Actually a Mississippi attorney

20  too.  Document examiner, no.  I back away from

21  that.

22      Q      Okay.

23      A      If it relates to a property/casualty

24  liability policy or some document, I'd

25  probably look at it.  But I don't know if I

1    would classify myself as an expert.  I am

2    pretty good on history.  I know what that

3    phrase usually means, and I'm not going to go

4    out as document expert.

5         Q    What about due diligence?

6         A    Yeah.  I've done five due

7    diligences.  I bought three operations.  So I

8    could due diligence a company for -- in the

9    insurance field.

10        Q    Ethics?

11        A    I teach ethics as part of my course.

12        Q    Okay.  What exactly do you teach in

13   connection with ethics?

14        A    That's the CPCU ethics course.

15        Q    Okay.

16        A    As to what the proper relationship

17   is in peoples dealings with their customers.

18   Ethics is a very simple term.  Give the person

19   what they are supposed to have.

20        Q    Does it have anything to do with

21   litigation since your business is involved in

22   litigation?

23        A    Well, I can only discuss areas that

24   I have had exposure to.  And what would the

25   proper person do under the same set of

1  circumstances or what should they have done, I
2  will voice an opinion on that based on what
3  happened.
4       MR. SWAIM:
5              Before we get ahead of ourselves,
6  Pat, I would like to go ahead and attach these
7  website documents as Exhibit No. 2.  You might
8  want to flip through it.  I think there's more
9  than area of expertise.  It's just a straight
10 printout of what popped up when I put your
11 name in.
12      A     Summer project to create a new one.
13 I did that a long time ago.  That's what I
14 need to do.
15 BY MR. SWAIM:
16      Q     I guess you could do it yourself?
17      A     I did.
18      Q     You did.
19      A     I did that myself.  That's why it
20 looks the way it does.  It could be a lot
21 better the way these people design things
22 today.
23      MR. SWAIM:
24             Looks okay.  We'll go ahead and
25 attach these as Exhibit No. 2.

1                    (Exhibit No. 2 is marked.)

2    BY MR. SWAIM:

3         Q    What about evidence?

4         A    Depends.

5         Q    On what?

6         A    On what the evidence is.  Relating

7    to insurance operation?  That advertisement

8    you are looking at was created by an insurance

9    advertising company.  They pretty much put

10   down what they want.  I have gone through this

11   a couple of times with them, but they just

12   don't take it out.

13            If evidence relating to insurance

14   claims was an issue, I would look at it, and I

15   would either voice an opinion or back away.

16   It depends.

17        Q    But what does that mean?  Are we

18   talking about underwriting files or insurance

19   policies or --

20        A    All of that.

21        Q    What are we talking about?

22        A    All of that.  That's evidence as to

23   what people can submit as evidence in a claim

24   file or evidence that they don't -- that's not

25   appropriate, that would not be usually used in

1    an insurance procedure.

2        Q    Okay.  Would that include courtroom

3    exhibits?

4        A    Too specific.  I leave that to the

5    judges and lawyers to decide courtroom

6    exhibits.

7        Q    Of course, you already mentioned

8    fires?

9        A    Fire, yeah.

10        Q    And that's causes and origin?

11        A    I'm not a cause and origin expert,

12    although I have been able to define what cause

13    and origin relates to from prospected

14    purported expert's reports.

15        Q    Okay.  Flammable materials?

16        A    That, I would qualify myself as an

17    expert on.  I've done a lot of that.

18        Q    Are these categories that I'm

19    referring to now outside of specific, say,

20    property claims related to a license or

21    something to that effect?  Is it all just

22    based on your work history and experience?

23        A    That's what they got it from when

24    they interviewed me.

25        Q    Okay.

1    A    So it fit into their program.  It's

2  not something I advertise I personally want to

3  do.  But whatever their website is -- I forgot

4  which one it is, they created this document.

5        We spent an hour and a half one day

6  in a deposition.

7    Q    Did you really?

8    A    Yeah.

9    Q    We're not going to spend an hour and

10  a half on it, although Pat was thinking I was,

11  we are not.

12        What about fraud related to the

13  insurance agency?

14    A    Fraud, I would definitely consider

15  myself as someone who has enough expertise to

16  qualify as an expert.  I created five

17  different fraud units.  I found a lot of bad

18  guys.

19    Q    What about industry standards in the

20  insurance fields?

21    A    I believe I'm qualified enough to

22  look at all of the industry standards and know

23  what they are and what they are not.

24    Q    So you are not just referring to

25  just Massachusetts; you are referring to all

1    states across the board?

2        A    When I teach, I teach all states

3    across the board.  Commercial general

4    liability policy, I teach.  Some of the agents

5    that I teach come -- or some of the casualty

6    people and underwriters don't just necessarily

7    work in Massachusetts.

8        Q    Okay.  Have you taught any from

9    Mississippi?

10       A    I doubt it.

11       Q    Okay.  Then, of course, just

12   insurance in general, insurance claims,

13   coverage, operations, you would consider

14   yourself to be an expert in all of that?

15       A    Yes, sir.

16       Q    Bad faith?

17       A    I have done more than 20 bad faith

18   cases in multiple jurisdictions.

19       Q    Okay.  Is that the -- primarily what

20   you do in your consulting business today?

21       A    Actually, no.  What my primary

22   role -- bad faith is there.  I do a lot of bad

23   faith work, but the majority of my income

24   comes from insurance companies hiring me to

25   define if they have done the right thing.

1      Q    Okay.  In connection with bad faith?

2      A    In conjunction with the consulting

3 or an expert testimony view.  They get sued.

4 I get hired by -- most of my money comes

5 from -- I would say 70 percent comes from

6 insurance companies.

7      Q    Okay.  But isn't that pretty much

8 the same thing?  They are asking you to

9 determine if they did the right thing,

10 meaning, whether they handled the claim in

11 good faith or bad faith?

12      A    No.  A lot of issues are just bad

13 faith.  It's just straight claims handling.

14      Q    Okay.  So they are looking for you

15 to give them advice so they can make a

16 recommendation?

17      A    Or testify that the claim was

18 handled correctly.

19      Q    Okay.

20      A    And the payments made were correctly

21 made.

22      Q    Could you give me, to the best of

23 your recollection, some of the insurance

24 companies that you are referring to that hire

25 you to do this work?  And correct me if I'm

1      wrong.  You said that was 70 percent?

2          A    Income.

3          Q    Income?

4          A    I have a set fee just because it's

5      worked out that way:  60 percent of my claims

6      count comes from insureds; 35 percent of my

7      claims count is insurance companies that have

8      hired me.  There's about 5 percent straight

9      tort work, where they have asked me to look

10     at -- either for an insurance company or

11     against an insurance company on straight tort

12     issue, not a contract issue, not claims

13     handling.  But was the claim priced right; did

14     everybody do what they needed to do; did the

15     insurance company do what they were supposed

16     to do; or did the opposition do what they

17     should have done.

18         Q    So more of your work is on behalf of

19     the insured rather than the insurer, but the

20     insurer pays you more money?

21         A    The insurer because their problems

22     are much more complicated.  Last year

23     75 percent came from one case.  The insurance

24     company was Lloyds and it was like 475

25     workers' comp cases I had to evaluate and