IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF

MISSISSIPPI, SOUTHERN DIVISION

RSUI INDEMNITY COMPANY,

  Plaintiff/Counter-Defendant,

                    CIVIL ACTION NO.

VS.                1:07cv893-LG-JMR

NEW PALACE CASINO, LLC,

  Defendant/Counter-Plaintiff.

DEPOSITION OF:

ALAN MCCOIN


EXHIBIT 3

1  question that I've asked you before we
2  take a break.  Is that okay?
3      A.  Yes.
4      Q.  We will try not to talk over
5  each other so that the court reporter
6  can get all the information down.
7      A.  Yes.
8      Q.  Can you state your full name and
9  your business address?
10     A.  Alan H. McCoin, 115 Office Park
11 Drive, Birmingham, Alabama 35223.
12     Q.  And as we discussed, you have
13 been nominated or designated as a
14 30(b)6 corporate rep for Cobbs, Allen
15 and Hall to testify regarding certain
16 aspects of a lawsuit that's been filed
17 between RSUI and New Palace Casino for
18 property claims made as a result of
19 Hurricane Katrina.  Do you understand
20 that?
21     A.  Yes.
22     Q.  What is your title with Cobbs,
23 Allen and Hall?
24     A.  Vice president, claims, claims
25 advocate.

1  Q. How long have you been working at Cobbs, Allen and Hall?
3  A. August 2004.
4  Q. Were you always a claims advocate in your position at Cobbs, Allen and Hall?
7  A. Yes.
8  Q. Were you always vice president of claims?
10 A. Yes.
11 Q. Where did you work before Cobbs, Allen and Hall?
13 A. Vera Claim, Incorporated.
14 Q. What is Vera Claim?
15 A. Independent insurance adjusters.
16 Q. How long did you work for Vera Claim?
18 A. Five years.
19 Q. What about before that?
20 A. Crawford and Company.
21 Q. What's Crawford and Company?
22 A. Independent insurance adjusters.
23 Q. And you worked as an adjuster for Crawford?
25 A. Executive general adjuster.

Alan McCoin                                June 3, 2009

Page 15

1  understand it and make certain that
2  the carrier and/or representative will
3  explain things in a manner in which
4  they can receive.
5      Q.  And you act as an advocate on
6  behalf of your client in relation to
7  claims presented to the carrier?
8      A.  Yes and no.
9      Q.  When you say yes or no, why is
10 that?
11     A.  We are not -- when we say claim
12 advocate and representing our client
13 only, well, we also have to take in
14 the fact we placed the carrier, we
15 placed the coverage with the carrier.
16 So there's no adverse circumstances or
17 there's no -- if we are going to place
18 the coverage with someone, we don't
19 want to -- we are not here to make
20 them upset with us.  We have a loss
21 ratio, so we have no motive to inflate
22 a claim.
23     Q.  What is a loss ratio?
24     A.  It is something that we are
25 evaluated on by our carriers that we

895bef58-969b-4229-8ccb-aeebe7ee522b

1   write business with annually.
2       Q.  In the claims adjustment process
3   as a claims advocate, do you ever
4   provide advice to your insureds about
5   ways to successfully resolve that
6   claim with the insurance company?
7       A.  Yes.
8       Q.  What sorts of advice does that
9   entail generally?
10      A.  Make sure the lines of
11  communication remain open, make
12  certain that insurance company
13  representatives keep their line of
14  communication open and that the
15  information flow is -- whatever
16  specific information in detail is
17  required, that the policyholder
18  provides that to the claim
19  representative.
20      Q.  So you advise your insureds to
21  cooperate in the process and to --
22      A.  Sure.
23      Q.  -- provide documentation and
24  information that's requested from the
25  insurance companies?

1    A.   Yes.
2    Q.   And that's because in their
3 adjustment of the process, they are
4 trying to get to the facts of the
5 matter and find out whether this cause
6 is covered under the policy or what
7 the extent of damage is; is that
8 right?
9    A.   Would you rephrase that, please?
10   Q.   Sure.  The reason they need --
11 the carriers need this information is
12 to determine whether a specific loss
13 is covered under the policy; is that
14 right?
15   A.   I don't know if your statement
16 is correct or not.
17   Q.   Why not?
18   A.   Again, rephrase your statement.
19   Q.   I'm not going to rephrase it.
20 I'm just asking you if you understand
21 what I'm asking you.
22   A.   Do I understand whether you're
23 trying to give me a leading question?
24       MR. TINDAL:  He's asking --
25   Q.   Do you --

1    Q.   And you don't know the identity
2    because you weren't asked in your role
3    as a claims advocate to assist in this
4    respect or you just don't remember?
5    A.   I don't remember.
6    Q.   Okay.  Was Modern Gaming a
7    company that was retained to perform
8    work after Katrina?
9    A.   That sounds like one of the
10   vendors that assisted with some of the
11   machines, electronic machines or
12   electronic slot machines that they
13   had.
14   Q.   Do you know who the Cunningham
15   Group was?
16   A.   I don't remember.
17   Q.   What about Roy Anderson
18   Corporation?
19   A.   The name sounds familiar.  I
20   don't remember what their role was.
21   Q.   What about Wright, Stagg and
22   Associates?
23   A.   I don't remember.
24   Q.   Do you know who Knesal
25   Engineering Services are?

1  remember or you are unaware because
2  since that time you have not been
3  involved with the adjustment process?
4      A.  Not much involvement.
5      Q.  When would you say that your
6  involvement stopped with the
7  adjustment process and being a claims
8  advocate or an adjustment advocate?  I
9  forgot how we phrased it.
10     A.  Once the suit was filed.
11     Q.  Did you ever advise New Palace
12 Casino as a consultant or claims
13 advocate that retaining consultants
14 and performing an independent
15 evaluation or an evaluation that they
16 paid for would be beneficial to the
17 claims adjustment process?
18     MR. ZACHARY:  Note our
19 objection to form.
20     A.  We did not really foresee any
21 need of that because we had
22 established communications with Engle
23 Martin, and we felt confident that
24 Engle Martin and RSUI would fulfill
25 their obligations under the policy

1  faith.  That's two heavy words in the
2  insurance claims world and legal
3  world.
4      Q.  So you would not say that they
5  adjusted this claim in bad faith?
6      MR. TINDAL:  Object to the
7  form.
8      A.  Not to my knowledge.  I don't
9  know that they did, but I don't know
10 that they didn't, if they did
11 something behind the scenes that we
12 don't know about.
13     Q.  It's possible that there's just
14 a disagreement as to the cause of this
15 damage?
16     A.  Could be.
17     Q.  When is the last time you have
18 contacted or been contacted by
19 representatives of New Palace Casino
20 about the adjustment of the claim or
21 how the claim was being handled?  And
22 I'm not talking about your meeting
23 today with Mr. Zachary.
24     A.  Well, we meet with New Palace
25 about ongoing business and we do claim